IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 23-cv-01871-GPG-MDB

JAVIER AGUIRRE,

      Petitioner,

v.

RACHEL TILLMAN,

      Respondent.

---

## ORDER

Before the Court is Petitioner Javier Aguirre's Verified Complaint and Petition for Issuance of a Show Cause Order and for Return of Minor Children to Colombia (D. 1). The Court held a bench trial on February 14-16, 2024, with both parties physically present and testifying. The Court GRANTS the petition for the following reasons.

## I. BACKGROUND

This expedited civil action arises under the Hague Convention on the Civil Aspects of International Child Abduction (the Convention), to which the United States is a signatory, and implemented by the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9003(a). ICARA provides federal district courts with original jurisdiction under 28 U.S.C. § 1331 over petitions seeking the return of children pursuant to the Convention.

Petitioner, a Colombian citizen, and Respondent, a United States citizen, were married in the United States in May 2012. The parties resided together in Bucaramanga, Colombia since

1

approximately 2012 and were residing together in Piedecuesta, Colombia prior to the events that precipitated this case.  Petitioner currently lives full-time in Colombia and works as a full-time professor in the Department of Philosophy of Universidad Industrial de Santander.  Respondent has been the full-time provider of uncompensated childcare, previously worked as an ad hoc professor at the Universidad Industrial de Santander, and in July 2022 began a position in the Department of Education of the Universidad Cooperativa de Colombia (UCC).  The parties have two minor children (E.S.A.T. and O.A.A.T.), who were born in Colombia in 2015 and 2018.

The parties do not dispute that Respondent was permitted to take the minor children to Colorado on November 21, 2022, for a family reunion in the United States to meet and socialize with Respondent's extended family.  When leaving Colombia, Respondent was informed that her U.S. passport had less than six months remaining and was set to expire.  Upon advice from an agent with Migración Colombia, Respondent sent her passport for expedited renewal in the United States to avoid any delays in returning to Colombia.  By December 5, 2022, Respondent's new passport had still not arrived, Petitioner was informed of this, and Petitioner acquiesced to the extended stay based on Respondent's need for a renewed passport.  On December 6, 2022, Petitioner emailed Respondent asking whether he should enroll the minor children in school in Colombia, to which Respondent thanked Petitioner for managing payment (Pet'r's Ex. 25).  On December 15, 2022, Respondent still had not received her renewed passport and attempted to attend a scheduled mediation session remotely with her Colombian solicitor and Respondent.  Respondent learned that Petitioner had canceled the mediation and that it would not be rescheduled until Respondent and the minor children returned to Colombia.

Respondent claims that at this point (i.e., December 15, 2022), she did not feel safe to return to the marital home in Colombia as she alleges that she is the victim of economic, psychological, domestic, and gender-based/sexual violence perpetrated by Petitioner. In particular, Respondent alleges that Petitioner physically groped her genitals with his hands and without her consent on numerous occasions and pressured her for sex in exchange for funding for daily household expenses. Respondent also alleged that Petitioner made veiled threats against her in front of the children that were embedded within songs or games (e.g., playing a game with the children but making "stabbing motions" in the air with a toy and in her direction). Respondent testified that she did not believe the minor children saw these unwanted touchings and/or sexual violence. Respondent alleges that the mediation session was supposed to establish safety guidelines for the parties to continue cohabitating with the minor children while divorcing and that Petitioner's cancellation of the mediation session made her feel unsafe as she would be forced to return to the marital home without any established safety parameters.[1] Respondent testified that she had filed a domestic violence report (denuncia) with the police and provided the denuncia to the Comisaria de Familia de Piedecuesta (a social services department) and requested a protection order. Respondent testified that she also requested mediation in the Piedecuesta Family Commissioner's Office.

---

[1] Respondent testified that she was not in control of the finances, did not have access to the joint marital bank account, did not have a support network, and did not have independent access to a vehicle. There was cross-examination about whether Respondent could rent a separate residence, which this Court will briefly discuss infra.

Additionally, Respondent testified that Petitioner has repeatedly falsely accused Respondent in Colombian court proceedings of being a lesbian in order to bias the divorce and custody proceedings as Colombian society is "still very homophobic." The Court cannot examine this issue as it goes to the underlying merits of the custody dispute and does not rise to the level of grave risk to the minor children. The Court notes that Petitioner included this false allegation in his trial brief (and apparently with his counsel's consent), but the Court gave it no weight (see D. 32 at 4).

Separately, Respondent testified that she suspected potential sexual abuse of the minor children by Petitioner based on statements[2] made by the minor children and observed questionable interactions with Petitioner and the minor children.  The questionable interactions included: (1) witnessing her children strike Petitioner's buttocks while he was fully clothed during a type of spanking game[3]; (2) witnessing Petitioner lying in bed with the minor children while listening to an audio story—Petitioner was lying fully-clothed next to O.A.A.T., who was also fully-clothed, and was stroking O.A.A.T.'s head while O.A.A.T. was allegedly rubbing or touching his genitals with his hands over his clothing[4]; and (3) O.A.A.T. became upset and threw a tantrum at the prospect of co-sleeping with Petitioner (where both parents had been co-sleeping with the minor children prior to the separation).

---

[2] Respondent did not testify as to the content of the statements due to a sustained hearsay objection from Petitioner but testified that the children had allegedly made statements to Respondent that gave her concern.

[3] The Court notes that when Respondent testified about this issue, she also used hand gestures that seemed to indicate that the children were also touching Petitioner's side and hip areas.  When asked if Respondent considered it "innocent fun" she replied:

> A: I viewed it as a clear lack of sexual education on the part of their dad, minimum. I think that it's the adult's job to help children understand what a safe boundary is so that if an adult asks them to touch that part of their body, they know right away that's a no. And that was clearly not happening in that scenario.

[4] Regarding this incident, Respondent testified:

> A: In my mind, self-pleasure, which is a normal part of sexual exploration for a young child, and affection at parental touch should never mix in the same moment. I believe it is the parent's job to teach that job to their children, and it was very disturbing on a deeply gut level to see this scene between my son and -- and their dad.
>
> Q. What did you do when you witnessed that scene?
>
> A. I quickly looked for a way to interrupt the scene without causing any shame for O.A.A.T. because he doesn't know, he was four at the time. And so I just kind of made an aversion . . . And then I did try to talk later with Javier about what had happened.
>
> Q. What was Mr. Aguirre's response to that?
>
> A. He -- he said he hadn't noticed that that was happening.

4

Petitioner denies sexually or physically abusing the minor children and separately filed a domestic violence report against Respondent when Petitioner did not return to Colombia with the minor children.  Petitioner also testified that he initiated proceedings under the Convention in Colombian courts but then filed for the return of the minor children in the U.S. District Court for the District of Colorado in July 2023.  Respondent testified that she did not report these occurrences of suspected sexual abuse or seek to have the children evaluated for sexual abuse by a medical professional while in Colombia.  Respondent did seek counseling for the minor children in Colorado via TESSA of Colorado Springs but alleges that Petitioner did not give consent for the minor children to speak with a therapist and, therefore, the minor children did not receive any therapy or counseling for potential sexual abuse.

On January 28, 2023, Respondent sent an email to the minor children's school in Colombia and stated:

> While we are here, we are taking advantage of the time to get to know their other country, their other language, their other family, their other history. With my mom who has a degree [i]n education, as well as me, we have them in a bilingual reading program and in a schedule of outings and educational and playful activities, such as walks in the woods, trips to the zoo, the aquarium, museums, the many and diverse parks in the metropolitan area, STEAM workshops, sports classes, music, Spanish and French, robotics and computer workshops, gatherings for students at botanical gardens, Nature Centers (nature learning centers) and ecological farms to learn about the ecosystems of this area, field trips to study the pre-colonial history of the area, etc. *We miss our community and our home in Colombia, and I am doing my best to return soon.* At the same time, the children are very happy, enjoying and getting to know the winter, improving their English, getting to know their other country, and deepening their ties with their family here.

(Pet'r's Ex. 26 (emphasis added)).  Respondent testified that the minor children were later enrolled in school in Colorado Springs.

On the second day of trial, during cross-examination of Respondent, the Court heard testimony from Respondent that prior to leaving Colombia, in July 2022, she had signed an indefinite-term contract for individual employment as a full-time or part-time professor with UCC and a lease for a rental property in Colombia, in August 2022, where she could live independently from Petitioner.  On re-direct, Respondent clarified that the lease for the property was never finalized as her income as a professor with UCC did not result in enough income to pay the monthly rent and she had to cancel the lease.  Respondent did not testify as to whether she is currently employed in the United States, still employed with UCC, or whether she has enough funds to rent a separate residence if she were to return to Colombia.[5]  Respondent did testify that she would return with the minor children if the Court ordered the minor children to be returned to Colombia. Respondent later stated on the stand:

> I am simply asking that we be allowed to stay here until the Colombian authorities come to their -- to their measured decision. It has been a long road. I've persisted in seeking answers and help and protection from the Colombian authorities, and those are forthcoming, I believe, but they're not ready yet. And we are -- we are not safe in Colombia right now.

The Court heard testimony via video from Lina Marcela Estrada Jaramillo, a practicing family law solicitor in Colombia and retained as an expert in Colombian law by Petitioner.  Ms.

---

[5] Respondent testified that the Colombian courts were seizing a percentage of Petitioner's pay for child support. Respondent also testified during cross-examination that, at certain times in 2023, money was transferred to her account, but she would not state on the record who was transferring the money to her.  While Respondent attempted to indicate that she was unaware of the source of these transfers, the Court did not find that disavowal credible.  It appears to this Court that the transfers either came from Petitioner or were on behalf of Petitioner (perhaps upon order from a Colombian court).  Respondent testified that Petitioner appealed the child support order and argued that the minor children "have neither home nor residency in Colombia."  Neither party supplied this Court with testimony or evidence regarding the current status of the child support order.

Estrada Jaramillo briefly testified that there are three provisions of Colombian law, among others, that pertain to parental rights and custody:  (1) the Political Constitution of Colombia, (2) the Colombian Civil Code, and (3) the Childhood and Adolescent Act.  Under Article 23 of the Code of Childhood and Adolescence, there is a joint parental obligation and authority of the parents, which in turn results in a right of custody under Colombian law held jointly by the parents.  Also citing Article 253 of the Colombian Civil Code, Ms. Estrada Jaramillo testified that the parents had a right to cohabit and live with their child as well as jointly exercise responsibilities over the children; thus, any prevention of this would result in a breach of parental and custody rights under Colombian law and the Convention.  The Court inquired whether this right to cohabit permitted shared custody in separate residences or established a division of time (i.e., visitor rights) for parents no longer living together.  Ms. Estrada Jaramillo answered in the affirmative to these questions.  Ms. Estrada Jaramillo opined that both Petitioner and Respondent were exercising custody rights over the minor children at the time of their departure from Colombia.

The Court heard expert rebuttal testimony from Dr. Belisario Valbuena Trujillo (retained as a rebuttal expert by Respondent) who is a forensic psychologist licensed in Colombia specializing in forensic psychology, intimate partner violence, and vicarious violence.  Dr. Valbuena Trujillo has testified in Colombian courts as an auxiliary expert for the judiciary in cases where there has been intrafamily violence and speaks on behalf of victims.  Dr. Valbuena Trujillo testified that there was a distinction between custodial rights and custody and that other laws, such as international treaties for children's rights, can apply in certain circumstances when conducting a custody evaluation for Colombian courts.

## II.  FINDINGS OF FACT

The parties have stipulated to several facts:

1. Petitioner and Respondent are the parents of two (2) minor children, namely, E.S.A.T., born in Piedecuesta, Colombia on August 6, 2015; and O.A.A.T., born in Piedecuesta, Colombia on March 19, 2018. The children are both minors under the age of sixteen (16) who are thus subject to the terms of this Convention in accordance with Article 4 thereof.

2. The minor children resided with the parties in Colombia until November 21, 2022.

3. Both minor children are Colombian citizens and United States citizens.

4. Petitioner signed a permit providing Respondent permission to temporarily travel to the United States with the minor children for the period of November 21, 2022, to December 5, 2022.

5. Petitioner did not provide permission or consent to Respondent remaining in the United States with the minor children, after December 29, 2022.

6. The Petitioner did not consent to the minor children remaining in the United States after December 30, 2022.

7. The Respondent, Rachel Tillman, came to the United States with the minor children on November 21, 2022.

8. The habitual residence of the minor children on November 21, 2022, was Colombia.

9. Until November 21, 2022, the Petitioner, Javier Aguirre, was exercising custody rights pursuant to Colombian law.

10. There is presently ongoing divorce, child custody, and separation of assets proceedings involving both parties and the minor children in Colombia.

(D. 30).

The Court makes the following findings of fact:

1. The parties were involved in some form of marriage dissolution and custody proceedings (i.e., mediation and court proceedings) in Colombia

prior to Respondent leaving Colombia with the minor children. The Colombian family court has not yet determined custody arrangements over the minor children or finalized the parties' divorce proceedings. There is no anticipated date when the Colombian courts will issue a divorce decree or custody order.[6]

2. Petitioner resides in Colombia and declined the Colombian court's offer to have supervised visits with the minor children in the United States.

3. Respondent currently resides in Colorado with the minor children. If this Court orders the minor children to be returned to Colombia, Respondent stated under oath that she will return with the minor children to Colombia due to her expressed concerns for the minor children's safety.

4. E.S.A.T. and O.A.A.T. were habitual residents of Colombia immediately before their removal to the United States. Petitioner consented to Respondent traveling to the United States with E.S.A.T. and O.A.A.T. from November 21, 2022, to December 5, 2022, but did not consent to the minor children being retained in Colorado after December 5, 2022.[7]

5. E.S.A.T. and O.A.A.T. have not returned to Colombia since their departure in November 2022 and have been in the United States for over fourteen months.

6. The date of the wrongful retention was, at the latest, December 15, 2022, when Respondent unilaterally decided that she and the minor children would remain in Colorado because she felt unsafe to return to Colombia after Petitioner canceled the mediation proceedings.

7. Petitioner filed his Complaint on July 24, 2023, which is within the one-year window of the minor children's wrongful retention.

8. Respondent has not established that there are any substantiated allegations or documentation of physical or sexual abuse of the parties' minor children by Petitioner.

---

[6] It is unclear to this Court whether Respondent's decision to remain in the United States caused a delay in the Colombian court proceedings versus Petitioner's cancelation of the parties' mediation. The parties did not provide this Court with any testimony or evidence regarding the timeliness of dissolution and custody proceedings in Colombian courts.

[7] Petitioner, however, expressed understanding that Respondent needed to get her passport renewed and agreed to a short extension of the trip for that to occur.

### III.  ANALYSIS

The Hague Convention establishes the legal rights and procedures in order to ensure "the prompt return of children who have been wrongfully removed or retained" in a country that is a signatory to the Convention.  22 U.S.C. § 9001(a)(4).  Colombia has been a signatory under the Hague Convention on the Civil Aspects of International Child Abduction since June 1, 1996. *U.S. Hague Convention Treaty Partners*, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Feb. 19, 2024).  The primary purpose of this Court's role under the Convention is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court."  *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)).  Thus, the scope of the Court's inquiry in the instant case is limited to the merits of the abduction claim while the merits of the underlying custody case are not at issue.  22 U.S.C. § 9001(b)(4); *see also Watts v. Watts*, 935 F.3d 1138, 1141 (10th Cir. 2019).

To establish a prima facie case of wrongful retention, Petitioner must prove by a preponderance of the evidence that:  (1) E.S.A.T. and O.A.A.T. habitually resided in Colombia at the time of the retention by Respondent; (2) the retention breached Petitioner's custody rights under the law of Colombia; (3) Petitioner was exercising said custody rights at the time of retention or would have been exercising them but for the retention.  22 U.S.C. § 9001(e)(1); *see also Dumitrascu on behalf of A.M.B.D. v. Dumitrascu*, No. 21-CV-01813-PAB, 2021 WL 4197378, at *3 (D. Colo. Sept. 15, 2021), *aff'd*, No. 21-1341, 2022 WL 1529624 (10th Cir. May 16, 2022) (internal citations omitted).

If Petitioner establishes by a preponderance of the evidence that the retention of E.S.A.T. and O.A.A.T. was wrongful under the Convention, then the Court must order E.S.A.T. and O.A.A.T.'s return to Colombia unless Respondent can establish by clear and convincing evidence that one of the Convention's affirmative defenses is available.[8]  22 U.S.C. § 9001(e)(2).  In particular, under Article 13b of the Convention, a court "is not bound to order the return of the child if the court finds that the party opposing return has established that return would expose the child to a grave risk of physical or psychological harm."  *Golan v. Saada*, 596 U.S. 666, 676, (2022) (internal quotations omitted).

### A.  Prima Facie Case

#### 1.  Habitual residence

Defining "habitual residence" under the Convention is a fact-driven inquiry as the Convention does not define the term.  *Monasky v. Taglieri*, 140 S. Ct. 719, 726-27 (2020) (examining history and listing cases).  The child's residence can be considered "habitual" only when the child's residence is more than transitory. *Id.* at 726.  This requires this Court to examine whether "the child [is] at home in the particular country at issue." *Id.* at 730.  "The place where a

---

[8] Under § 9001(e)(2)(A), Respondent must establish "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies."  These affirmative defenses are:  (1) grave risk of exposure to physical or psychological harm under Article 13b; and (2) return of the minor child would violate the fundamental principles of the requested State regarding the protection of human rights and fundamental freedoms under Article 20.

Under § 9001(e)(2)(B), Respondent must establish "by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies."  These affirmative defenses are: (1) the proceeding commenced more than a year after the removal or retention and the minor child is well-settled in the new location under Article 12; (2) the petitioner was not actually exercising custody rights at the time of retention, or subsequently acquiesced to the retention under Article 13a; or (3) the minor child objects to being returned and has attained an age of maturity where the court may appropriately take account of his/her/their views under Article 13.

Because Respondent only argued that there is a grave risk to the minor children if they are returned to Colombia, Respondent's burden of proof in establishing such a claim under Article 13b of the Convention is clear and convincing evidence.

child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* at 726. "On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." *Miller*, 240 F.3d at 400 (internal quotations and citation omitted). Here, the parties stipulated to the fact that the habitual residence of the minor children on November 21, 2022, was in Colombia. There was no evidence presented at trial to support the conclusion that the parties intended to relocate permanently as a family to the United States. The minor children were born in Colombia and lived solely in Colombia until Respondent improperly retained them in the United States in December 2022.

Respondent argues ambiguously, however, that the habitual residences of E.S.A.T. and O.A.A.T. have changed to Colorado since November 21, 2022.[9] Under Article 12 of the Convention, Respondent can raise the "well-settled" defense to show that there has been a change in the children's habitual residence. *Dumitrascu*, 2021 WL 4197378, at *11; *see also Calixto v. Lesmes*, 909 F.3d 1079, 1084 (11th Cir. 2018). This defense, however, may only be raised "if more than one year has elapsed from the wrongful removal before the date of commencement of these proceedings." *In re Robinson*, 983 F. Supp. 1339, 1344 (D. Colo. 1997) (citations omitted). The parties, however, have stipulated to the fact that Petitioner did not consent to the minor children remaining in the United States after December 30, 2022. Based on this date and Petitioner's initiation of legal action for the return of E.S.A.T. and O.A.A.T. in this Court by July

---

[9] Respondent did not rely upon the well-settled defense, but counsel did argue that the children were settled in Colorado:

> Yes, Your Honor. I would point the -- the Court and counsel to the trial brief that was filed on January 31st where we do discuss the issue of whether or not the children have become settled here. I understand this is a bit of a gray area [from] the sense that the Hague petition was filed within the year. However, we are 15 months out from when the children arrived here in Colorado.

24, 2023, Respondent cannot utilize the "well-settled" defense.  Most tellingly, Respondent's email to E.S.A.T. and O.A.A.T.'s school in Colombia on January 28, 2023, stated that "[w]e miss our community and our home in Colombia, and I am doing my best to return soon."  Furthermore, Respondent has asked this Court to permit her to stay in the United States just until the Colombian courts have issued a divorce decree and custody order.  This indicates to the Court that the habitual residences of E.S.A.T. and O.A.A.T. remain in Colombia.

But even if the petition was filed more than a year after the wrongful retention, such defense would still be unavailing.  Under the well-settled defense, courts consider the following factors: (1) "the child's age"; (2) "the stability and duration of the child's residence in the new environment"; (3) "whether the child attends school or [daycare] consistently"; (4) "whether the child has friends and relatives in the new area"; (5) "the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs"; and (6) "the respondent's employment and financial stability." *Dumitrascu*, 2021 WL 4197378, at *12 (listing cases).  Respondent did not provide any evidence to the Court that E.S.A.T. and O.A.A.T. (approximately ages 8 and 5, respectively) have developed connections to the community beyond Respondent's family, established friendships with other classmates, or that Respondent's employment history is stable or consistent.  Indeed, the Court only heard testimony from Respondent's sister and father that the children were happier, and their moods had stabilized since leaving Colombia and living at their grandparents' home in Colorado Springs.  This testimony is not enough to support the "well-settled" defense. *See, e.g., Filho v. de Albuquerque*, No. 1:20-CV-01421-RBJ, 2020 WL 9455201, at *10 (D. Colo. Aug. 21, 2020) ("If the well-settled defense were applied to facts like these, the defense would swallow the Convention.").  Respondent does

not argue that Petitioner consented or acquiesced to the unlawful retention of the minor children; thus, the Court does not need to examine this affirmative defense. *See Gil-Leyva v. Leslie*, No. 17-CV-01406-KLM, 2018 WL 10322064, at *5 (D. Colo. Apr. 17, 2018), *aff'd*, 780 F. App'x 580 (10th Cir. 2019).

### 2. *Petitioner's exercise of custody rights under Colombian law*

There is no dispute that the habitual residence at the time of retention was Colombia. Therefore, Colombian law determines whether Petitioner has custody rights and if Petitioner was exercising lawful custody of the children at the time of retention. The U.S. Court of Appeals for the Sixth Circuit has noted:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Friedrich*, 78 F.3d at 1066. Respondent alluded to the fact that Petitioner may have abandoned his custody rights by not providing financial support and terminating Respondent's access to their shared marital Colombian bank account. However, Respondent did not present evidence or establish through expert testimony that such actions forfeited Petitioner's custodial rights under Colombian law. *See e.g., In re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1035 (D. Colo. 2014) (finding that failure to contact or provide support did not equate to forfeiture of the petitioner's custody rights under New Zealand law); *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 612 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002)

(finding that the petitioner did not abandon her custody rights under Colombian law when she granted permission for the minor child to visit family in the United States and the respondent unlawfully retained the minor child).

### B.  Article 13b: Grave Risk to Minor Children and Intolerable Situation

Respondent argues that sending the minor children back to Colombia will expose them to grave risk.  Under Article 13b, the Court is not obligated to return the minor child if "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Golan*, 596 U.S. at 670–71.  Respondent must show by clear and convincing evidence that there is a "severe . . . level of risk and danger to the child." *Livingstone v. Livingstone*, No. 22-1308, 2023 WL 8524922, at *2 (10th Cir. Dec. 8, 2023) (internal citations and quotation omitted).  The U.S. Court of Appeals for the Tenth Circuit has ruled that the grave risk exception applies to prevent a child from returning to (1) "a zone of war, famine, or disease"[10]; or (2) "serious abuse or neglect, or extraordinary emotional dependence when the country of habitual residence for whatever reason may be incapable or unwilling to give the child adequate protection." *West v. Dobrev*, 735 F.3d 921, 931 n.8 (10th Cir. 2013) (listing cases).

The Tenth Circuit has noted that spousal abuse or intimate partner violence is relevant under Article 13b only if it "seriously endangers the child" such that a "clear and long history of [partner] abuse" suffices to show a propensity for child abuse. *Gil-Leyva v. Leslie*, 780 F. App'x 580, 590 (10th Cir. 2019) (internal quotations and citations omitted).  However, the court's hands are tied if the respondent only establishes isolated incidents of abuse and these incidents "generally

---

[10] No testimony or argument was propounded on this point; thus,  this Court will not analyze it.

demonstrate a risk of harm only to the spouse." *Id.* (finding that spanking by the petitioner of the minor children did not rise to the level of constituting grave risk under Article 13b); *but see Johnson v. Johnson*, No. 22-CV-1910-WJM-MDB, 2023 WL 3081682, at *11 (D. Colo. Apr. 13, 2023) (finding that the minor child's testimony of sexual assault was highly credible and rose to the level of grave risk). Respondent testified that she felt Petitioner was making threats at her via children's games and songs (i.e., quoting a song about Sancho Panza and Don Quixote while making stabbing motions in the air or referencing the exile of colonizers and white imperialists from Colombia while looking at her[11]). Respondent also testified that on unspecified dates, Petitioner demanded sex in exchange for funding for basic household needs and forcefully groped her vulva outside her clothing and without her consent while in a vulnerable position. Respondent testified that these incidents of unwanted touching were not witnessed by the children. While these allegations are concerning to the Court, they unfortunately do not rise to the level of grave risk that is envisioned by Article 13b. Respondent also has failed to provide clear and convincing evidence establishing that Petitioner has sexually abused the minor children.[12]

Under these circumstances, E.S.A.T. and O.A.A.T. have been wrongfully retained in the United States and Respondent has failed to establish that any available affirmative defenses apply.

---

[11] Respondent testified that these statements were significant because she is from the United States and Petitioner referred to her as a "cold, white northerner."

[12] Respondent did not ask this Court to consider any ameliorative measures. Additionally, because the Court finds that Respondent has not met her burden of establishing grave risk to the minor children, the Court will not proceed to consider any ameliorative measures. *See Golan*, 596 U.S. at 682 ("[A]lthough nothing in the Convention prohibits a district court from considering ameliorative measures, and such consideration often may be appropriate, a district court reasonably may decline to consider ameliorative measures that have not been raised by the parties, are unworkable, draw the court into determinations properly resolved in custodial proceedings, or risk overly prolonging return proceedings . . . Ultimately, a district court must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention.").

Thus, under the Hague Convention and ICARA, the Court is required to order E.S.A.T. and O.A.A.T.'s return to Colombia forthwith.

## IV.  CONCLUSION

The Court finds that Petitioner has met his burden, and the record conclusively shows that Respondent wrongfully retained E.S.A.T. and O.A.A.T. within the meaning of the Hague Convention.  The Court finds that Respondent has not met her burden and the record does not support her claim that E.S.A.T. and O.A.A.T. are in grave risk of harm within the meaning of the Hague Convention if they are returned to Colombia during the pendency of the custody proceedings.  Accordingly, Petitioner's Verified Complaint and Petition for Issuance of a Show Cause Order and for Return of Minor Children to Colombia (D. 1) is GRANTED.

It is FURTHER ORDERED that Respondent shall ensure that E.S.A.T. and O.A.A.T. are on a flight to Colombia, accompanied by either herself or an appropriate caregiver who has the right to travel with E.S.A.T. and O.A.A.T. outside of the United States, no later than twenty-eight (28) days after entry of this Order (i.e., departing on or before March 20, 2024).

It is FURTHER ORDERED that Respondent, no later than seven (7) days before the date of E.S.A.T. and O.A.A.T.'s departure flight to Colombia, shall file under Level One restriction in this case a notice that informs petitioner of the details of E.S.A.T. and O.A.A.T.'s return flight to Colombia and with whom E.S.A.T. and O.A.A.T. will be traveling.

It is FURTHER ORDERED that Petitioner may file a post-judgment motion for the allocation of costs and expenses consistent with the procedures set forth in Federal Rule of Civil Procedure 54(d)(1) and D.C.COLO.LCivR 54.1.  Respondent will be responsible for paying all necessary expenses incurred by or on behalf of Petitioner, including court costs, legal fees, foster

home or other care during the course of proceedings in the action, and transportation costs related to the return of the children unless Respondent can establish that such order would be clearly inappropriate.  *See* 22 U.S.C. § 9007(b)(3).

It is FURTHER ORDERED that the Clerk of the Court shall close this case.

DATED February 20, 2024.

BY THE COURT:

_____
Gordon P. Gallagher
United States District Judge